**NEW YORK, C. & ST. L. R. CO. v. BURNET,**
**Com'r of Internal Revenue.**
No. 5638.

Court of Appeals of the District of Columbia.
Argued Feb. 13, 1933.
Decided March 6, 1933.

Adrian C. Humphreys and Newton K. Fox, both of Washington, D. C., for appellant.

G. A. Youngquist, Sewall Key, Morton K. Rothschild, C. M. Charest, and E. C. Algire, all of Washington, D. C., for appellee.

Before MARTIN, Chief Justice, and ROBB, VAN ORSDEL, HITZ, and GRONER, Associate Justices.

## GRONER, Associate Justice.

Appellant claims a deduction of $35,045.38 in 1917 as discount accrued in that year upon its first mortgage 4 per cent., 50-year bonds issued in 1887. It is a railroad company and was organized in 1887. Its predecessor company had been previously placed in receivership (precisely when does not appear) because of default in the payment of interest on its first and second mortgage bonds. The principal of the bonds, together with accrued interest, thereby became due and payable. It was ordered to pay the amount in default within ten days or suffer a sale of its property at public auction. The court having in hand the administration fixed the purchase price at not less than $16,000,000, of which not less than $100,000 should be paid in cash. Provision was made in the decree that the purchaser of the properties should have the right to satisfy the remainder of the purchase price over and above the amount required to be paid in cash by paying over and surrendering certain indebtedness of the receiver and first and second mortgage bonds and interest at such price or value as was equivalent to the amount the holders thereof would be entitled to receive if the amount of the purchase price was paid in cash. It was also provided that the purchaser of the properties should hold the same free and discharged of the lien of the mortgages securing the bonds.

In this situation certain of the bondholders and stockholders of the old company appointed a purchasing committee and authorized it to purchase the properties, rights, and franchises of the old company and to organize a new company to take them over. This committee drew up a plan to carry out the purchase agreement, and requested deposit of the bonds and stocks of the old company with the committee. A sufficient deposit of bonds and stocks being made, the committee purchased the properties of the old company at public sale from the commissioner appointed by the court, and having organized separate corporations in each of the states in which the properties were located, transferred the purchased properties respectively to these corporations, taking notes or stock or both in payment thereof, and following this it consolidated these constituent companies with appellant company and received from the latter, in exchange for the notes and stocks of the constituent companies so organized, its first mortgage 4 per cent. coupon gold bonds of an aggregate par value of $20,000,000, and first and second preferred and common stocks of a total par value of $30,000,000. Of the total of appellant's first-mortgage bonds $16,800,000 par value were delivered by the purchasing committee to the former holders of $15,000,000 par value of the first mortgage bonds of the old company; in other words, $1,120 par value of new bonds were delivered for each $1,000 par value of old bonds deposited with the committee. There is nothing in the agreed statement of facts to explain the difference of $120 per $1,000 of bonds, though a part if not all, it may be assumed, represented the accrued and defaulted interest. Likewise $1,155,830 par value of appellant's first mortgage bonds were transferred to the former holders of $1,046,000 of the old company's second mortgage bonds, or on the basis of $1,105 par value of new for each $1,000 of old bonds. The remaining first mortgage bonds aggregating a little in excess of $2,000,000 were held for the use of appellant. Preferred and common stocks of appellant were delivered to the committee and transferred to the depositing former holders of stocks of the old company subject to an assessment of $10 per share.

This appeal relates solely to questions arising out of the transaction in relation to the sale or transfer of the bonds of the consolidated corporation, appellant. The transaction, appellant says, is in all respects the same as if it had sold $17,955,830 of its first mortgage bonds for $16,046,000 of cash and with such proceeds paid off the old bonds. If that is true, the commissioner concedes appellant would have sustained a "discount"

of $1,909,830, and have a right to deduct the amortized portion thereof each year as deferred interest payable at the maturity of the bonds. This grows out of the rule of the treasury providing, when bonds are issued at a discount, the discount may be amortized for income-tax purposes over the life of the bonds by deducting the annual proportion thereof from the gross income for each year.

In the view we take of the case, it is not necessary either to criticise or pass upon the correctness of this rule (See Regulations 45, art. 544 (3) ; a like rule has continued in effect to date.) Conceding its correctness for present purposes, we nevertheless think the right to deduct the amortized part of the aggregate, difference in the old and new bonds does not exist in the facts attendant upon the taking over by appellant of the properties of its predecessor company. This is due primarily to the fact that the two corporations are distinct and separate legal entities with equally distinct and separate rights and liabilities.

The old company, as we have pointed out, defaulted in its mortgage, and its properties were ordered sold to satisfy the lien. They were bought, and the purchaser, the committee, received a deed. Thereafter the purchaser transferred separate parts of the property to each of several newly organized corporations for a definite consideration as to each such transfer, and when this was accomplished these several corporations were consolidated into a single corporation, which in turn issued and delivered $20,000,000 of its mortgage bonds in part consideration of the properties acquired in the consolidation. Thus the sale of the properties of the old company and the application of the proceeds, through the machinery of the court, to the payment of the old bonds for all practical purposes extinguished that indebtedness. When the consolidation was had, the consolidated company, the appellant, did not assume the liabilities of the old company. Instead it issued its own securities in payment of what it got, and we think, as the Board of Tax Appeals thought, that it is of no consequence that the transferees of the new securities were in most respects the holders of the old. Appellant, however, insists with great earnestness that while the facts stated are correct and while there may be in fact the technical legal difference between the old and new corporations which we have pointed out, they are, as a practical matter, the same, and it relies upon the decision in Western Maryland v. Commissioner (C. C. A.) 33 F. (2d) 695, 698, as sustaining the position that

in such circumstances "courts will not permit themselves to be blinded or deceived by mere forms of law but, regardless of fictions, will deal with the substance of the transaction involved as if the corporate agency did not exist and as the justice of the case may require."

The rule that courts will look beyond the shadow to the substance is well recognized, but we think it has no applicability here. It is applied in cases mostly in which to disregard it would be to countenance a fraud, or, as the Supreme Court said in Burnet v. Commonwealth Improvement Co., 53 S. Ct. 198, 77 L. Ed. ——, decided Dec. 12, 1932, in "unusual cases." The present is not an unusual case. It is not even the case of a reorganization of an old corporation in which the new corporation assumes the obligations of the old as was the case in Western Maryland v. Commissioner, supra. Here, as we have seen, the old bonds were discharged. When they were originally issued or the terms under which they were issued we do not know, but when the foreclosure occurred they were paid and canceled. The bonds issued by the new corporation represented the price paid by it for the properties which it acquired, and this cost was duly set up on its books. So far as the appellant is concerned, it was of no consequence to it how the new bonds were distributed. The purchasing committee, having acquired the old bonds, bought the property at the foreclosure and caused a number of new corporations to be formed, to which they severally conveyed parts of it, and in turn, through consolidation of these corporations, appellant became owner of all the properties of the old company, issuing its bonds and stock in payment.

There is nothing in the agreed statement of facts, nor in the "deposit agreement" made part of it, which will justify us in saying that the new bonds were issued and sold at less than par. Equally there is nothing in the record to prove, or even to suggest, that the property acquired by the new company was less in value than the face of the bonds issued to acquire it. Indeed, all that is pointed out in this respect is the single fact that the holders of the old bonds received in the final consummation of the foreclosure and sale between 10 and 12 per cent. excess of par of new bonds over their respective par holdings of old—a sum doubtless exactly equal to the defaulted interest thereon, since, as appears from the record, the old bonds had, by agreement of their holders, been de-

posited since 1885 with a trust company—doubtless because of default in interest as of that time. So that even if we should regard the foreclosure and sale as merely a reorganization and the new company as in all respects the alter ego of the old, we would still have nothing before us on which to base a conclusion that the new bonds were sold or delivered at a discount. In such a case to say that, because in the basis of exchange, to which we have adverted, there was an apparent difference in amount, such difference is the sum capable of being amortized for income-tax purposes, would be, as we think, to read into the tax statutes a provision for which no basis can be found.

The decision of the Board of Tax Appeals was right and should therefore be affirmed.

Affirmed.